IN THE MATTER OF: A.N.G., D.A.G., and G.M.G.
No. COA09-1365.
Court of Appeals of North Carolina.
Filed: April 6, 2010.
This case not for publication
Robin K. Martinek for Petitioner-Appellee Randolph County Department of Social Services.
Mercedes O. Chut for Respondent-Appellant Mother.
Pamela Newell Williams for Guardian ad Litem.
McGEE, Judge.
Respondent-Mother appeals from an order terminating her parental rights to her nine-year-old daughter, A.N.G.; four-year-old son, D.A.G.; and three-year-old daughter, G.M.G. (the children). All three of Respondent-Mother's children were fathered by Respondent-Mother's half-brother. When Respondent-Mother was fifteen, her half-brother, hereinafter referred to as Respondent-Father, came to live with Respondent-Mother and her family. Respondent-Father was twenty-one years old at the time. Respondent-Mother and Respondent-Father became physically intimate shortly after Respondent-Father moved in. A.N.G. was born when Respondent-Mother was sixteen years old.
After the birth of A.N.G., Respondent-Mother moved around with Respondent-Father and their mother. Respondent-Mother and Respondent-Father had two more children together, D.A.G. and G.M.G. Respondent-Mother also had another child, S.G., with another man, but that child is not part of this termination action.
In 2006, Respondent-Mother and Respondent-Father were living in Onslow County with the children. The family became involved with the Onslow County Department of Social Services due to reports of domestic violence. Additionally, six-year-old A.N.G. had been sexually assaulted. Both Respondent-Father and his brother, a known sex offender, were named as the perpetrators. Respondent-Father was arrested and convicted of second-degree rape and taking indecent liberties with a minor. At the time of the termination hearing, he was serving a thirteen-and-a-half year sentence.
The children were adjudicated neglected in Onslow County District Court on 9 June 2006. Shortly thereafter, the case was transferred to Randolph County and the children were returned to the custody of Respondent-Mother on 7 February 2007. On 23 February 2007, Respondent-Mother entered into a safety assessment, in which she agreed that the children would not have contact with Respondent-Father's brother (the Uncle).
Respondent-Mother completed the ninth grade while pregnant with A.N.G. and never returned to school. When Respondent Mother received a parenting capacity evaluation on 22 May 2007 at the direction of DSS, the evaluation showed she had a full-scale I.Q. of 80, which placed her within the low-average to borderline-impaired range. In the evaluation, Respondent-Mother's academic skills are described as being at a seventh grade level.
The Randolph County Department of Social Services (DSS) filed juvenile petitions on 22 March 2007, alleging that the three children were neglected and dependent juveniles. The petitions alleged that, upon information and belief, A.N.G. had been sexually assaulted by the Uncle and by Respondent-Father and that Respondent-Mother violated the safety agreement by allowing the Uncle to have contact with the children. The children were taken into DSS custody pursuant to nonsecure custody orders and placed in foster care.
The trial court adjudicated the children[1] neglected and dependent on 2 July 2007, finding the allegations contained in the petition to be true. The trial court found that Respondent-Mother was unable to protect her children from a known sex offender, the Uncle, and that the children were born of an incestuous relationship. The trial court also made findings as to the children's health and well-being at the time of the hearing, finding that the children appeared to be in relatively good health and were adjusting to their placements, but that A.N.G.'s pediatrician noted a few concerns during her physical examination. The trial court continued custody of the children with DSS and granted Respondent-Mother weekly supervised visitation with the children. The trial court ordered Respondent-Mother to: (1) complete a psychological evaluation and follow any recommendations; (2) continue individual counseling; (3) participate in the children's counseling when deemed appropriate by their counselor; (4) maintain appropriate housing; (5) maintain appropriate employment; and (6) complete parenting classes.
During the next year, Respondent-Mother made progress carrying out her case plan. She completed parenting classes and a psychological evaluation. She also visited the children regularly, paid child support, and had full-time employment and a residence. She also began therapy with Jane Cranford (Ms. Cranford) shortly after the children were placed in DSS custody. Despite missing some appointments, Ms. Cranford testified that Respondent-Mother worked hard and participated when she came to counseling. However, Respondent-Mother lost Medicaid coverage and could not pay for the therapy sessions. Ms. Cranford encouraged Respondent-Mother to apply for funding through an indigency program, and she began seeing a new therapist, Bill Garrot (Mr. Garrot), in August 2007.[2]
The trial court held a permanency planning hearing on 13 February 2008 and, in an order entered 12 May 2008, changed the permanent plan from reunification to adoption and termination of parental rights. In the order, the trial court detailed the findings of Respondent-Mother's psychological evaluation, including her pattern of making poor decisions, such as allowing two sex offenders to be with the children. Based on the findings, the trial court found that "individuals with [Respondent-Mother's] profile display a very stable pattern of inappropriate behavior leading to negative outcome, followed by remorse and contrition, followed by a repeat of inappropriate behavior. It is unlikely that such a pattern will change."
The trial court also found that Respondent-Mother's relationship with her therapist, Mr. Garrot, was compromised and "unlikely to be effective in the future." In a letter to Wendy Triplett, Respondent-Mother's foster care social worker, Mr. Garrot detailed the following: Respondent-Mother had missed four appointments with Mr. Garrot. She had lied to him about her relationship with her boyfriend at the time. In January 2008, Mr. Garrot found out that Respondent-Mother was pregnant and had been living with her boyfriend for a few months. However, she failed to disclose the pregnancy to Mr. Garrot and told him that she had no plan to move the boyfriend into her home in the near future. Respondent-Mother and her boyfriend were married on 10 February 2008. The trial court found that Respondent-Mother had not been "forthcoming truthfully" about the relationship with her new husband until the hearing date. Based on Respondent-Mother's lack of candor with the trial court and her therapist, her unresolved co-dependency issues, and her repetitive poor decision-making, the trial court could "not find likely that the minor children would return to [Respondent-Mother's] home within the next six months." However, the trial court also found that it was not in the best interests of the children to direct the filing of petitions to terminate the parental rights of Respondent-Mother at that time.
The trial court conducted another permanency planning hearing on 22 October 2008 and, in an order entered 18 November 2008, directed DSS to file petitions to terminate Respondent-Mother's parental rights. The trial court found that several new issues had impacted Respondent-Mother's life. She gave birth to her fifth child on 4 July 2008, and DSS was concerned with her ability to care for another child. DSS was also concerned that her new husband had drug dependency issues and a criminal record, and had recently been incarcerated. The trial court found that Respondent-Mother, through a referral from Sandhills Mental Health, began treating with a new therapist, Sue McKendry (Ms. McKendry), in February 2008. However, Ms. McKendry switched agencies and Respondent-Mother was unable to pay for therapy.
DSS filed motions to terminate both parents' parental rights to A.N.G., D.A.G., and G.M.G. on 6 January 2009. DSS alleged the following grounds for termination as to both parents: (1) neglect and (2) willfully leaving the children in foster care for more than twelve months without showing reasonable progress to correct the conditions that led to removal. DSS also alleged that Respondent-Father had willfully abandoned all three children and had abused A.N.G.
The trial court conducted a termination hearing on 29 April 2009, 20 May 2009, and 10 June 2009. During the adjudication portion of the hearing, Mr. Garrot, Ms. McKendry, and social worker Wendie Emerson testified on behalf of DSS. Respondent-Mother testified on her own behalf.
The trial court entered three separate orders, one on 29 July 2009 and two on 20 August 2009, terminating Respondent-Mother's parental rights to A.N.G., D.A.G., and G.M.G. Respondent-Father signed voluntary relinquishments of the children for adoption on 25 March 2009. The trial court first found the existence of both grounds alleged against Respondent-Mother in support of the request that her parental rights be terminated. The trial court then determined that it was in the children's best interests to terminate Respondent-Mother's parental rights. Respondent-Mother appeals from these orders.
Pursuant to N.C. Gen. Stat. § 7B-1111(a) (2009), a trial court may terminate parental rights upon a finding of one of ten enumerated grounds. "So long as the findings of fact support a conclusion [that one of the enumerated grounds exists] the order terminating parental rights must be affirmed." In re Humphrey, 156 N.C. App. 533, 540, 577 S.E.2d 421, 426 (2003) (internal citation omitted). In this case, the trial court found that two grounds existed to terminate Respondent-Mother's parental rights to the children. Although Respondent-Mother challenges both grounds for termination, "[a] single ground under [N.C.G.S. §] 7B-1111 is sufficient to support an order terminating parental rights." In re J.M.W., 179 N.C. App. 788, 789, 635 S.E.2d 916, 917 (2006). Therefore, if we determine that the findings of fact support one of the grounds, we need not review the other ground. See Humphrey, 156 N.C. App. at 540, 577 S.E.2d at 426.
N.C. Gen. Stat. § 7B-1111 includes neglect as one of the grounds for terminating parental rights and provides, in pertinent part:
(a) The court may terminate the parental rights upon a finding of one or more of the following:
(1) The parent has abused or neglected the juvenile. The juvenile shall be deemed to be . . . neglected if the court finds the juvenile to be . . . a neglected juvenile within the meaning of G.S. 7B-101.
N.C. Gen. Stat. § 7B-1111(a)(1) (2010). "Neglected juvenile," in turn, is defined as follows:
Neglected juvenile.  A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15) (2010).
On appeal, we review the trial court's orders to determine "whether the trial court's findings of fact were based on clear, cogent, and convincing evidence, and whether those findings of fact support a conclusion that parental termination should occur[.]" In re Oghenekevebe, 123 N.C. App. 434, 435-36, 473 S.E.2d 393, 395 (1996) (citation omitted). In this case, the trial court made one lengthy finding of fact, finding number 7A(1),[3] to support the conclusion that the children were neglected:
[Respondent-Mother] [f]ailed to complete individual counseling to address her co-dependency issues and her inability to provide a safe, stable, and appropriate home for the minor child. [Respondent-Mother] was referred to Ms. Jane Cranford for individual counseling. [Respondent-Mother's] counseling ended with Ms. Cranford prior to [Respondent-Mother's] completion of counseling due to the [Respondent-Mother's] financial inability to continue counseling with Ms. Cranford; [Respondent-Mother] had lost her Medicaid coverage. Subsequently, DSS social worker Wendie Emerson referred the Mother to Sandhills Mental Health Center to obtain individual counseling. Subsequently, the Mother began counseling with Therapist Bill Garr[ot] of Therapeutic Alternatives. [Respondent-Mother] attended her intake appointment with Mr. Garr[ot] on August 15, 2007 and she attended 3 subsequent sessions on September 11, 2007, October 12, 2007, and December 14, 2007. [Respondent-Mother] missed sessions on September 25, 2007, January 4, 2008, January 23, 2008, December 14, 2007. [Respondent-Mother] missed January 4, 2008 due to her visiting her husband in jail. [Respondent-Mother] offered no reasons why she missed her other appointments with Mr. Garr[ot]. [Respondent-Mother's] last session with Mr. Garr[ot] was on January 14. [Respondent-Mother] did not complete therapy with Mr. Garr[ot]. [Respondent-Mother] had intentionally misled Mr. Garr[ot] about her relationship with her then boyfriend and subsequent husband. [Respondent-Mother] indicated to Mr. Garr[ot] that her boyfriend was not living with her when she was attending therapy sessions but he actually was living with her. This court in February 2008 ordered [DSS] to locate a new therapist for [Respondent-Mother] to allow her more time to complete individual counseling.
Subsequently, DSS social worker Wendie Emerson referred [Respondent-Mother] to Therapist Sue McKendry. [Respondent-Mother] began seeing Ms. McKendry on February 25, 2008. [Respondent-Mother] attended sessions with Ms. McKendry from February 2008 to June 2008 but [Respondent-Mother] missed a session in June 2008. Also, [Respondent-Mother] failed to attend the July 9, 2008 session. After missing the July 9, 2008 session, [Respondent-Mother] did not schedule a session with Ms. McKendry again until October 31, 2008. [Respondent-Mother] failed to attend counseling sessions between July and October 2008 due to a lapse in her Medicaid coverage. [Respondent-Mother's] Medicaid coverage was reinstated in August 2008. [Respondent-Mother] failed to attend her scheduled counseling session on October 31, 2008 because she had no transportation. Ms. Emerson had provided transportation assistance to [Respondent-Mother] previously, but [Respondent-Mother] did not request transportation assistance to her therapy appointments. [Respondent-Mother] did not attend a counseling session set for November 17, 2008. [Respondent-Mother] did attend her November 24, 2008 session with Ms. McKendry but she did not attend her December 8, 2008 due to lack of transportation. [Respondent-Mother] attended her December 15, 2008 session but she did not attend her December 22, 2008 scheduled session. Ms. McKendry had no contact phone number or address for [Respondent-Mother] to communicate with her regarding her missed appointments. Ms. McKendry closed [Respondent-Mother's] case on March 10, 2009 due to [Respondent-Mother's] failure to contact or communicate with Ms. McKendry for a period of three months. Subsequently, [Respondent-Mother] called Ms. McKendry in March after she closed her case to schedule an appointment with Ms. McKendry. She did schedule an appointment for March 30, 2009 but [Respondent-Mother] did not attend it because she had no gas. Ms. McKendry has not heard from [Respondent-Mother] since [Respondent-Mother] called Ms. McKendry in late March 2009 to reschedule her appointment for March 30, 2009. [Respondent-Mother] has not re-entered treatment with Ms. McKendry at this time. Ms. McKendry believes that [Respondent-Mother] was making progress in her therapy but she had not accomplished her therapy goals. Also, Ms. McKendry believes that [Respondent-Mother] is not able to make good decisions regarding the care of [Respondent-Mother's] children.
Respondent-Mother challenges three specific statements in the trial court's finding on the grounds that they are not supported by evidence in the record. As further explained, we disagree, and find that each statement is supported by clear and convincing evidence.
First, Respondent-Mother challenges the portion of the finding stating that her "Medicaid coverage was reinstated in August 2008." Respondent-Mother contends that this statement inaccurately shows that she abandoned counseling. Respondent-Mother's own testimony supported this statement when she testified that, while pregnant, she was receiving limited Medicaid benefits, which did not cover counseling. However, she also indicated that full Medicaid benefits were reinstated after the birth of her fifth child, testifying that she received her "regular Medicaid card" around August 2008.
Secondly, Respondent-Mother challenges the statement that she failed to communicate with Ms. McKendry for a period of three months before Ms. McKendry closed her case in March 2009. Respondent-Mother again argues that this finding is inaccurate because it suggests that she abandoned therapy with Ms. McKendry. Respondent-Mother claims that, instead, she failed to attend because she could not afford Ms. McKendry's therapy without Medicaid. While we acknowledge that Respondent-Mother lost Medicaid eligibility for a period of time, she also had full Medicaid benefits reinstated after the birth of her fifth child, and the period of time this statement refers to is well after the reinstatement. Moreover, Ms. McKendry's testimony shows that Respondent-Mother had no contact with Ms. McKendry between 22 December 2008 and March 2009, and that, after three months without contact, her case was closed. Respondent-Mother admitted this lapse in time. Therefore, we conclude that this finding is supported by clear and convincing evidence in the record.
The last statement in finding of fact number 7A(1) which Respondent-Mother challenges is the statement that "Ms. McKendry believes that [Respondent-Mother] is not able to make good decisions regarding the care of [Respondent-Mother's] children." Respondent-Mother appears to argue that Ms. McKendry's statement was too general to support this finding, and that her care for her newborn child serves as evidence that she is capable of caring for A.N.G., D.A.G., and G.M.G. We disagree. In several instances, Ms. McKendry testified that Respondent-Mother would likely continue to exhibit the same issues throughout her life and that her dependent personality disorder would make it more difficult to resolve the issues. She also testified that she would not have felt comfortable with the children returning to Respondent-Mother's care at the time that she was providing therapy to Respondent-Mother, evidence that sufficiently supports the trial court's finding.
Finally, Respondent-Mother challenges finding of fact number eight on the grounds that it is improperly classified and is actually a conclusion of law. Finding of fact number eight states that "there is a likelihood of repetition of neglect if [the] child[ren] were returned home." "A `conclusion of law' is the court's statement of the law which is determinative of the matter at issue between the parties." In re Hughes, 74 N.C. App. 751, 759-60, 330 S.E.2d 213, 219 (1985). Within the context of termination of parental rights cases, the likelihood that neglect will recur is a component of proving neglect. Such a finding, standing alone, is conclusory, requires factual support, and is a conclusion of law. However, we may consider an improperly classified finding of fact along with the challenged conclusions of law, which we do in this case. See In re T.H.T., 185 N.C. App. 337, 345, 648 S.E.2d 519, 524 (2007), aff'd in part, modified in part, 362 N.C. 446, 665 S.E.2d 54 (2008) (determining that an improperly classified finding of fact could be considered with the challenged conclusions of law).
Next, we review the findings of fact to determine whether they support the trial court's conclusion that A.N.G., D.A.G., and G.M.G. were neglected juveniles within the meaning of N.C. Gen. Stat. § 7B-1111(a)(1). When a child has not been in the custody of a parent for a significant amount of time prior to the termination hearing, as is the case here, "the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect." In re Shermer, 156 N.C. App. 281, 286, 576 S.E.2d 403, 407 (2003) (citations omitted). Because the determinative factor is the parent's ability to care for the child at the time of the hearing, we previously have explained that "requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible." Id. at 286, 576 S.E.2d at 407 (citations omitted). "Thus, the trial court must also consider evidence of changed conditions[.]" Id. The trial court may then "find that grounds for termination exist upon a showing of a 'history of neglect by the parent and the probability of a repetition of neglect.'" In re L.O.K., 174 N.C. App. 426, 435, 621 S.E.2d 236, 242 (2005) ( quoting Shermer, 156 N.C. App. at 286, 576 S.E.2d at 407).
The trial court's findings of fact in this case establish that each child was previously adjudicated neglected. This satisfies the first prong of our analysis. Next, we determine that finding of fact number 7A(1) is sufficient to establish the second prong, that repetition of neglect was likely if the children were returned to Respondent-Mother.
Respondent-Mother argues that the finding fails to establish a likelihood of repetition of neglect for several reasons. First, she contends that the Uncle was the reason her children were taken away, and that the problem had been resolved because she no longer had contact with him. Next, she argues that future neglect was not likely, because she had completed everything in her case plan, except the required counseling. Finally, Respondent-Mother contends that Ms. McKendry's testimony was too general to establish a finding that she would repeat any neglect in the future.
We disagree with Respondent-Mother's contentions, and after reviewing the record, find that the trial court's factual finding is sufficient to establish a likelihood of the repetition of neglect. The finding establishes that Respondent-Mother has serious "co-dependency issues" and issues related to "her inability to provide a safe, stable, and appropriate home" for her children. Although not detailed in the finding, these issues include exposing her children to sex offenders and her recent decision to marry and have a fifth child with an individual who has substance abuse problems and a lengthy criminal record. The record also establishes that therapy was an essential part of Respondent-Mother's ability to remedy these problems and that she failed to follow through. Although some issues were beyond her control, such as losing Medicaid coverage and Ms. McKendry's move, some of the issues were well within her control, such as missing appointments, failing to re-enter therapy in a timely manner after having Medicaid reinstated, and her apparent inability to cooperate with and be truthful with Mr. Garrot. Indeed, had Respondent-Mother not lied to Mr. Garrot regarding her relationship with her husband, she could have continued to receive therapy from him regardless of her Medicaid status. Based on the foregoing history of neglect by Respondent-Mother and considering her inability to show sufficient evidence of changed conditions, the trial court's findings were sufficient to show a probability that Respondent-Mother would continue to repeat her same pattern of neglect of the children if they were returned to her care. Therefore, the trial court did not err in concluding that there was a likelihood of future neglect if the children were returned to Respondent-Mother. We affirm the trial court's order terminating Respondent-Mother's parental rights to the children.
Affirmed.
Judges HUNTER and ERVIN concur.
Report per Rule 30(e).
NOTES
[1] S.G., who is not a party to this action, was taken into DSS custody, but was placed with her paternal grandmother. S.G. was also adjudicated neglected and dependent.
[2] In much of the record and transcript, Mr. Garrot's name is spelled "Garrett." Based on our review of the record, we find that "Garrot" is the appropriate spelling and, therefore, use it throughout this opinion.
[3] The trial court entered three separate orders terminating Respondent-Mother's parental rights to each child. The adjudicatory findings of fact in each order are nearly identical in substance, with any major differences being attributed to the differences among the three children. All findings pertinent to this opinion are identical in all three orders. Unless otherwise indicated, our references to the findings of fact are presumed to include all three orders.